**UNITED STATES of America, Plaintiff,**

**v.**

**David PARDUE, Jack Pardue, Michel Pardue, Defendants.**

**Cr. Nos. 90–50012–01, 90–50012–02 and 90–50012–03.**

United States District Court,
W.D. Arkansas,
Fayetteville Division.

May 13, 1991.

**514**

J. Michael Fitzhugh, William Cromwell U.S. Atty., Fort Smith, Ark., for U.S.

Phillip Moon, Fayetteville, Ark., for David Pardue.

John Wesley Hall, Little Rock, Ark., for Jack Pardue.

Jenniffer Morris Horan, Fayetteville, Ark., for Michel Pardue.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Defendants, Jack Pardue (the grandfather), David Pardue (the son), and Michel Pardue (the grandson), were indicted in a three-count indictment charging them with violation of 18 U.S.C. § 1958 and 18 U.S.C. § 371. Specifically, defendants were charged with use of the mail or other facilities of interstate commerce or causing others to use such facilities and to travel in interstate commerce or to cause others to so travel to commit murder in Arkansas. In layman's terms, this is a "murder for hire" case. The case was tried to a jury from April 1 through April 5, 1991, and, after almost five hours of deliberation, defendants were all convicted. Pending before the court are separate Rule 29 motions for judgment of acquittal filed by all defendants.

## Facts

David Pardue, son of Jack Pardue, and father of Michel Pardue, was charged in state court in Benton County with robbing a Wal-Mart store in April of 1987. It appears from the evidence that David had a long history of engaging in shoplifting activities with various other individuals in Arkansas and surrounding states. In April of 1987 David and his confederate, Bob Harrington, were engaged in this activity when confronted by a woman security guard employed by Wal-Mart. A chemical known as "Mace" was sprayed on the guard and the shoplifters fled. David was later arrested and was tried in December of 1987. After being convicted by the jury of the robbery charge, he was sentenced to a five-year term of imprisonment and was sent to the Varner Unit of Cummins Prison operated by the Arkansas Department of Correction. At some subsequent time not shown by the evidence, his confederate in the robbery, Bob Harrington, came to the attention of the local prosecutor's office in Benton County. For whatever reason, the prosecutor, David Clinger, did not charge Harrington, but instead, with Harrington's help, charged David with committing perjury and causing others to commit perjury during his December, 1987, trial.

Two of David's jailmates when he was in the Benton County jail, Bobby Jones, and Joe Head, both convicted felons themselves, testified in behalf of the government in the trial in this court that during David's incarceration with them in the Benton County jail he indicated a desire to have someone kill Harrington. Head testified that David told him "if I go to jail, he (Harrington) is a dead man." Jones said that David also offered money to him to kill or have someone kill "these people." Jones also claimed that David "thought Clinger should be dead." He said that when he was released from jail, David gave him a code name of "Scanner" and a telephone number that he was to call, apparently to arrange the murder. He said that the telephone number belonged to David's son, Michel, but when he called the number several months later and used the code name, the party who answered "hung up."

Apparently soon after arriving at the Varner Unit of Cummins, David talked to a fellow inmate, David Wayne Coleman. This conversation with Coleman and the various conversations with Gary Garrett described below took place during sessions of the "Substance Abuse Training Program" (called by the inmates SATP class). It appears that this program, which, from its name, seems to have laudable purposes, was in reality an inmate run program with little supervision which most if not all of the inmates attended whether they were claimed to have substance abuse problems or not because it was an opportunity to meet with the other inmates in a largely unsupervised atmosphere. At least in respect to this case, it appears that the inmates utilized this time to discuss and plan other criminal endeavors.

In any event, according to Coleman's testimony, during one of those sessions, or immediately after the session, David asked Coleman if he knew anyone on the outside who could "scare someone." Coleman told him that he did not but that another inmate, Gary Garrett, professed to have contacts on the outside that could apparently accomplish about anything anyone might want accomplished. Coleman suggested that David might discuss the matter with Garrett.

Garrett and David attended SATP classes together and "became friends." Accordingly to Garrett's testimony, David told him about his problems and that Harrington was a "backstabber" and that he "wanted him taken care of." Garrett said that David wanted someone to kill Harrington, his wife, and small daughter and that he would pay $10,000 for the job, $5,000 to Garrett and $5,000 to the person he obtained who accomplished it.

Garrett, who might be the most reprehensible character ever to testify before this court, obviously immediately started plotting to ensnare David and members of his family for no other purpose than to benefit Garrett. He told David that he could obtain someone on the outside to kill the persons as David desired and he had

the unsuspecting David write for him what was introduced as government's Exhibit # 1 which said:

I want both of them picked up. I want her left in Oklahoma somewhere. 'Just over the border'. And him never found!

David also gave to Garrett a piece of notebook paper introduced as government Exhibit # 2 which contained a hand drawn map of Arkansas showing the location of Gentry where Harrington lived, and other surrounding towns, and the address of Bob Harrington which was shown as 300 S.W. Giles Street, Gentry, Arkansas. He also obtained from David a rather good photocopy of a picture of Bob Harrington and a not so good copy of a picture of Harrington's wife, introduced as government's Exhibit # 3.

Armed with that damaging evidence, Garrett immediately set out to gain an advantage for himself. In a casual conversation he asked David the name of the prosecuting attorney responsible for convicting him, and was given the name of David Clinger. On April 30, 1990, he mailed a letter to Clinger (government's Exhibit # 4) advising him, among other things, that:

I have certain information and can get you enough evidence to convict David Pardue and some family members of a certain conspiracy charge. I cannot disclose the nature of the conspiracy in this letter. But can guarantee you it is a major charge. The penalty I believe would be probably *life*. (emphasis in original).

He went on to say that there was "little time to stop this from happening" and that "I'm sure we can come to some kind of agreement." He then told Clinger in a postscript that he could "guarantee you'll be pleased when you hear me out."

Garrett subsequently wrote additional letters to Clinger or other officials which were date stamped by the receiver as having been received on June 4, 1990 (government's Exhibit # 5), June 6, 1990 (government's Exhibit # 6), June 15, 1990 (government's Exhibit # 8), June 22, 1990 (government's Exhibit # 9), June 29, 1990 (govern-

ment's Exhibit # 10), and July 11, 1990 (government's Exhibit # 10a).

In each of the letters it appears that Garrett attempted to prod the officials to "do something." In the letter stamped June 4, he said:

I believe I was working in good faith with the people you sent to talk with me and was under the impression you would do something for me. Please let me know what's going on.

In subsequent letters he told Clinger or other officials that he had talked with David and that David intended to get someone else to do the job if he could not find someone for him and that "we do not have much time." And "he's in a big hurry to get this over with."

It appears from the evidence that most of the contacts that Garrett had with authorities were with either David Clinger, the prosecuting attorney for Benton County, or state or local police officers apparently working under the direction of Clinger. However, at some point shortly prior to July 1, the Federal Bureau of Investigation became involved in the case. A letter was written by investigating officers to Garrett, purportedly from Garrett's cousin, "Chuck", advising Garrett that:

I got the stuff you sent me about the deal in Arkansas. I can help your friend with that problem of his. But not without ½ up front. I no (sic) how these things go. You know that might be all I get. Let me hear from you soon. I need some green.

While it is not completely clear from the evidence, it appears that this letter was written some time shortly before June 20, 1990, because, in a letter from Garrett to Clinger postmarked June 20, 1990, Garrett refers to "the letter your man mailed from Eagleton Ok."

In the June 20, 1990, letter Garrett also told Clinger that he expected David Pardue to respond to the letter written by the investigating officer and that it would "be wrote in his handwriting." Significantly, Garrett also told Clinger in this letter that:

He is real protective of his son. He don't want nobody else but me to meet him.

Unless they're with me. I've talked myself blue in the face to him but to no good.

However, Garrett, who was not easily deterred from his desire to help the authorities to help himself, reported to Clinger by letter postmarked June 28, 1990, that he "might have come up with a way for your man to meet with the people you want him to meet", and urged Clinger to contact him either by phone or in person.

FBI Agent, Gary Danzer, from Kentucky, then entered on the scene, posing as hitman, Chuck Ross, Garrett's cousin. July 1 was a regular visiting day at the Varner Unit and apparently Danzer was to meet Garrett during regular visiting hours and Garrett had apparently advised David Pardue that his cousin would be there on that date. The evidence indicates that visitation was held in a large room equipped with numerous small tables with four chairs provided at each table. The table where Garrett met with Danzer was some distance from the table being used by David Pardue and his son, Michel. Danzer, after first contacting Garrett at his table, then went to Pardue's table. He told Pardue that he could help him with his problem and, during his testimony, he said that David Pardue advised him that he wanted two people killed and he gave him at least some of the details. After a relatively brief discussion, Danzer told David Pardue that he did not want to talk with him there in the prison but that he would wait in the parking lot while David talked with his son, Michel, and if they were interested in hiring him to do the killing, Michel could meet him in the parking lot and advise him of that. He said that he would wait thirty minutes for Michel to appear.

Danzer waited in the parking lot at the Varner Unit, and Michel came out and discussed the matter with him. During that discussion Danzer was given $250.00. It appears to the court that the evidence indicates that, from that moment forward, Danzer played the part of a cold-blooded killer well (perhaps too well) and that, from that point forward, Danzer largely dictated to Michel how the plan was to be carried out and how and when they were to meet

in accomplishing it. As an example of the convincing performance that Danzer was capable of, David Pardue, an experienced criminal, according to Garrett's testimony told Garrett that Danzer appeared to be a cold-blooded killer that would do anything for money.

From the time Danzer entered the case he wore a "wire" to tape record his meetings with the Pardues. Unfortunately, according to Danzer, the tape recorder did not work properly during his meeting with David Pardue and Michel in the visitation room at the prison or on the parking lot where he met Michel. That is most unfortunate since those discussions and what was said and what occurred during them goes to the very heart of Michel's entrapment and outrageous conduct defense. Be that as it may, all other contacts between Danzer and Michel were recorded and the tape recordings were played during the trial.

It appears to the court, without question, that each and every contact that Michel had with Danzer during the course of this matter was planned and instigated by Danzer. The first of these occurred when Danzer called Michel at his girlfriend's home in Northwest Arkansas at 2:00 a.m. on July 2. Michel had given his girlfriend's number to Danzer when they met in the parking lot at Cummins. There was no explanation why Danzer called Michel at 2:00 a.m. rather than some reasonable hour of the day.

In any event, although Danzer had a reasonably good photocopy of a photograph of Harrington (government's Exhibit # 3) and had his address (presuming that he had received what other authorities had already received), during the telephone conversation at this early morning hour he advised Michel that he needed pictures of the Harringtons and asked Michel to get them for him. He told Michel that he would call him at 11:00 a.m. that morning because, "I'm gonna need to get ahold of you. I need to get this done, and get going." Whereupon Michel gave Danzer a beeper number that he could call in an attempt to contact him. Michel then

showed some uncertainty about whether Danzer could reach him at 11:00 a.m. and said, "If you don't get hold of me at noon tomorrow Chuck, get ahold of me tomorrow the first thing around six o'clock tomorrow evening or something like that. Is that all right?" Danzer replied, "Well I want to get this done if I can unless ya'll are not interested in doing it." Michel replied that he understood but explained that he had other things to do the next day and might be difficult to contact. Danzer concluded the conversation by saying that he would try to call him, and explained to Michel that when they met he wanted Michel to take him by the Harrington property and that he also needed for Michel to provide him with better photographs of the Harringtons. Danzer also advised that he expected another $250.00 when they met again.

At 11:00 a.m. that morning, Danzer called the beeper number that Michel had left with him, and when Michel returned the call, they made arrangements to meet at a Spe–Dee Mart in Gentry. They met in Gentry in mid-afternoon and, as Danzer had asked Michel to do, he took him by the Harrington property and pointed out their car parked in the driveway and the license number on it. A mere reading of the transcript of the tape recording made during the meeting shows that Danzer continued to play his cold-blooded killer role well. As an example, there was discussion about whether the Harringtons had a child, and when Michel advised him that he didn't know but had heard his grandfather say something about that possibility, Danzer said:

> You better find out what they want done with that kid cause I'm not particular, don't particularly cotton to having anybody testifying against me ... I don't want anybody testifying. If there is somebody in the house I need to know about it. If I can find them setting there, I want to get this thing done pretty quick, tonight probably.

At other times during the conversation he referred to the killing as "whacking them" and said that he needed the pictures to "make sure I know I'm going to get the right people. I don't want to come over here and whack the wrong people, you know, then I lose $4,500 and whatever problems you got you still got, but I don't want to do it twice."

Toward the end of their meeting, Michel, driving his automobile, led Danzer to the place near a dirt road where he had hidden the photographs of the Harringtons. Danzer pretended that he could not find them and had Michel come to the old tree stump where they were hidden to show them to him. They had a discussion and then Danzer indicated that the pictures were good and "that's all I need." He then told Michel he would call him about 6:00 p.m.

At six that evening Danzer called Michel and it is obvious from the recording of the telephone conversation that Danzer had decided that he needed to meet with Michel's grandfather, Jack Pardue, before the "killing" took place. Danzer told Michel in this conversation that he wanted to see the $4,000 balance that was owed him, although he did not expect to be paid until the job was done. He tried during the conversation, in several different ways, to get Michel to commit that his grandfather would meet with him to show him the money. Danzer said more than once during the conversation that he assumed grandpa had the money and tried to lead Michel into admitting that. For example, Danzer said: "Where is the money? Does your grandpa have the money? I mean that's, that's what I'd gathered from talking to you."

During the telephone conversation with Danzer, Michel had a brief conversation, through the use of call waiting, with his grandfather, and at the close of that conversation Michel obviously tried to tell Danzer about his grandfather's concerns expressed in that conversation but was interrupted repeatedly by Danzer. Michel finally was allowed to say: "He's saying its happening to, he, its happening too fast for him and its a little bit too fast for me, too." He goes on to tell Danzer that both he and his grandfather heard of the plan to kill the Harringtons for the first time during the visitation with David the previous day.

Danzer was not deterred. He insisted that Michel Pardue and his grandfather meet with him so he could view the money. He suggested, more than once, that they meet that very evening at Shoney's Restaurant in Fayetteville. Danzer pointed out to Michel that David had told him during the prison meeting that the job needed to be done by July the 8th or 9th because David was expected to be tried on the perjury charges shortly after that.[1] Michel tried to put him off by saying that his father believed that the trial would not go forward as scheduled because he intended to dismiss his attorney in that case and expected a continuance. Danzer insisted that they meet that evening and said that he needed to make certain that he was going to get paid, "cause I'm, you know, I may have to get somebody to give me a little help too and, I, you know, uh, I just wanta be able to do this, get my money." Toward the end of the conversation, still insisting that they meet that evening to view the money, Danzer explained his need to see the money by saying, "If I get somebody up here to, to help me then they're gonna want to kill me about the time I don't be able to come across with, do you understand what I'm saying? I got expenses and responsibilities." He then left a telephone number with Michel and it was agreed that he would talk with his grandfather and Michel would call him back.

A few minutes later Michel did so and agreed that he and his grandfather would meet Danzer at Shoney's that evening at 9:30 p.m. but that, "we're not going to have it with us, o.k.?" Danzer, apparently satisfied that he would finally get to meet and implicate in the plan the grandfather, replied, "O.k., I'll be down there."

At 9:30 p.m. that evening, Michel met Danzer at Shoney's in Fayetteville, but his grandfather did not appear. Danzer immediately again tells Michel that he has help coming to kill the Harringtons and that that individual is already on the way and that he needs to be able to satisfy him also. Michel again explains that the first time he

had heard of this plan was when Danzer met with his father in the prison on the day before and it is obvious from his end of the conversation that he did not want the murder to take place, at least not that night. Michel tells Danzer that both he and his grandfather wanted to have an alibi when the murder occurred. Danzer makes it obvious that he still desires to see the grandfather and, one of his reasons was that he needed to talk to him about the child that the Harringtons might have. In that respect he says, "That's a concern. I want to talk to grandpa about that too. I don't know what to do about that. You know, I don't really, I don't much want to do a kid." When Michel responded that he understood, Danzer said, "If it has to be done, see that's another complication, you know, I don't know, that's something I need to talk about too." Michel explained that his grandfather knew nothing more about the child and stated rather plainly that his grandfather did not want to meet him. In response, Danzer said, "Well that's his shot, you know, I gotta feel sure of myself. Sounds like he's the man. Sounds like he's the one that's calling the shot to me. Sounds like you're in the middle."

"Chuck" tells Michel that, "I got a, got a friend coming, you know, probably here now. Uh, you know, if you want to go tonight we'll go. It's that simple." Michel replied that his grandpa didn't like the idea of "going tonight, Chuck, cause its so, its happened so fast." Danzer then asked, "Does he wanna go with it or does he wanna go?" Michel's reply was that he did but that he thought that someone should talk with David about it and that he felt that he should be out of town when the murder took place. After much pressing, Danzer finally said, "In other words you still want'em whacked, you don't want'em whacked tonight?" Michel responds, "Right", and explains that he understands that Danzer might want to leave the area. Danzer replies that that was true, and points out that they said they wanted it

---

**1.** The evidence showed that, shortly before the trial on the perjury charges scheduled for July 10, David Pardue pled guilty to the charges and received an additional prison sentence of seven years.

done by the 8th and that he certainly couldn't guarantee that it would be if they didn't go forward with the plan at that time. Michel responded, "Oh, I understand. We, we don't mean to put you out Chuck, you know what I'm saying?" Michel later says, "I am trying to hold up my end of the deal. There's no breakdown on my part of it. You know what I am saying. If my dad wants it done well then I'm going to do everything possible to see that it gets ...". Danzer replied:

If you, uh, change your mind or if he changes his mind about well makes up his mind, you know, I don't think he changed his mind at all, makes up his mind, if grandpa makes up his mind what he wants done, about the only thing I can tell you is, uh, uh, you'll have to go through uh, uh, Gary to get ahold of me.

The conversation seemed to end on that note, and they left the Shoney's premises and proceeded to their respective vehicles. As they departed Danzer said that Garrett would know how to contact him. Michel said, "O.k.", and they said their goodbyes. It appears that car doors can actually be heard opening or closing but immediately thereafter, Danzer calls out, "Mike." Pardue responded and Danzer, who apparently was not willing to allow the matter to end where it had been left, advised Pardue that he would call him in about a week. Danzer said that he had to go to New Jersey to see some people and would call him when he got back.

As promised, on July 8, Danzer called Michel and asked if he or his grandfather had talked with David and whether the grandfather had gotten his alibi set. It is obvious from the telephone conversation that Danzer was not able to start the plan moving again, so the conversation terminated much as the meeting at Shoney's had by Danzer telling Michel that he would contact him later.

There were no further contacts between Michel and Danzer until September 16, 1990, and that conversation, initiated by Danzer, occurred after Federal Bureau of Investigation agents through activities described below, breathed new life into the plan. In the meantime, Benton County prosecutor, Clinger, had received, on July 11, 1990, another letter from Garrett asking that he be contacted so that he could learn, "how its going with helping get me out on early parole and back home with my family." He said that he had put himself and his family in danger to help the authorities and obviously expected something for it. Shortly after July 11 (apparently according to Garrett on July 14) David told Garrett that he did not want his people to contact his family any more about anything because "Chuck" was scaring them. It appears that nothing further occurred until FBI agent, Dick O'Connell, on July 31, 1990, wrote Garrett a letter received as government's Exhibit # 26. The letter was signed by "Chuck" and after pleasantries said:

Tell Pardue I was ready to do the job that night. I made 2 trips up there. I'm not the one who delayed it. I'm ready to go. But I want to be sure I get paid. Mike said he didn't have the money and his granddad wouldn't meet with me or show me any money or tell me he would pay. I know Pardue can't pay me from the pen so who's going to pay and when. Tell Pardue to write me.

He then gives his address as a post office box in Poteau, Oklahoma. In a few days, the FBI agents received a letter purportedly written by David Pardue and signed by him and Gary Garrett received as government's Exhibit # 27. The envelope indicated that the letter was postmarked on August 6. In the letter, "Chuck" was told that the delay was not David's fault and that he had not seen the money because, "my boy was leery of bring the money before the job was done because this was not in the agreement." He explains that the deal was that the remainder of the money would be forwarded to a post office box after the job was done and after he had been notified that it had been done. He said, "No more money will be paid until the job is done. The money will be payed to you. Have mine and Gary word on it." The letter contains a postscript signed by Garrett giving his word that, "Pardue is good for the money."

It appears from the evidence that little more occurred in respect to the plan after the August 6 letter from David except that Garrett continued to write prosecutor, Clinger, and state trooper, Bill Baskin, attempting to keep the matter moving forward, obviously for his benefit. He wrote letters attempting to accomplish this with postmarks of August 20 (government's Exhibit # 28) and two letters postmarked September 17, one to Clinger (government's Exhibit # 29) and one to Baskin (government's Exhibit # 30). The August 20 letter is a good example of the lengths to which Garrett had gone to attempt to urge the government to move forward and ensnare the Pardues and his reasons for doing so, so it is reproduced as Exhibit "A" to this opinion. In the September 17 letter to Clinger, he goes a giant step further by claiming that, "He told me the other day if I get out on some act he wants and expects me to finish the job for him and then contact his son after the job is done and pick up the rest of the money."

On September 10, 1990, more than two months after the last contact that Danzer had with Michel Pardue, Agent O'Connell and other police officers, along with Bob Harrington, staged the murder of Harrington and his wife. Harrington played his own part and a policewoman played the part of Mrs. Harrington. Government's Exhibit # 31 consists of two color pictures of Harrington with silver duct tape across his mouth and what appears to be blood running across his face and out of his ear from what appears to be a bullet wound immediately behind his right ear. One of the photographs shows what appears to be a woman lying behind Harrington. Her wrists are bound with silver duct tape.

On September 16, 1990, Danzer called Michel Pardue and in a telephone conversation in which he did almost all of the talking advised Michel, "Real quick. I've been in touch with your Dad. You talked to him?" After Michel advised that he had seen him that day, Danzer said, "O.k. Just told you, I got a letter from him. This thing is gonna go down the 18th, late at night or early in the morning on the 19th. You and your grandpa better get your ali-

bis set." Whereupon, Michel Pardue replied, "Well he never said anything to me about it today."

After Michel tells Danzer that he does not want him to call him at any other number, Danzer closes the conversation by saying, "All right, I won't call you anywhere else and I wanna show you some evidence it's been done so you can tell him." He then advises Michel Pardue that he will call him on the 20th. True to his word, on September 20 Danzer called Michel Pardue and told him, "The deal's done. I'm worn out. Uh, I need to get some proof and I need to, want you to look at and I need to get out of here. I'll be down at the Shoney's at five o'clock tonight. The same place we met." Michel replied, "O.k. Uh, well, Chuck I was going to tell you that I didn't want to meet with you but I guess its too late now." Danzer then, in effect, agreed that it was "too late" by saying, "Well, I gotta show you this proof. I wanna get my money."

Michel Pardue and Gary Danzer met at Shoney's in Fayetteville at approximately 5:00 p.m. on September 20. Danzer immediately, in the court's view, attempts to draw Michel out and get him to further incriminate himself and his grandfather by immediately asking, "You got your alibi set?" Michel replied, "Well, I'll just, uh, yeah." Danzer then asked, "How about your grandpa?" Michel's reply was, "I just don't like talking in here or anywhere else. I just don't like talking about it. The whole fucking deal makes me pretty nervous, you know."

Danzer then again tells Pardue that he and his grandfather had better get their alibis set and draws no response from Pardue. He then shoves a *Peoples Magazine* with the photographs of the staged murder taped in the center to Michel and says, "You tell your Dad what you saw. If your grandpa wants any evidence past that, he'll have to come look." After further discussion, Michel asks to see the pictures again, and it appears from his comments that he was trying to determine whether the photograph of the woman was in fact that of Harrington's wife. They then discuss how

the remainder of the amount owed to "Chuck" was to be sent to him and it is obvious from the recording that almost all the suggestions or directions in this respect came from Danzer. In fact, as in past conversations, Michel was allowed by Danzer to say very little, and was often interrupted by Danzer when he tried to talk.

In any event, the conversation terminated with Michel having received rather specific instructions on how the money was to be sent to "Chuck" to a post office box across the state line in Oklahoma. Danzer told Michel, "You get that money in the mail at the latest Monday. I'll be looking for it Tuesday."

As directed, Michel Pardue and his grandfather, Jack Pardue, gathered $4,500. It appears that at least half of that amount came from the grandfather's funds. They wrapped the money in a package along with a Bible and mailed it from Westville, Oklahoma, a small town a short distance across the state line. The label on the box was addressed to "Chuck Ross" at the post office box in Poteau, Oklahoma, where Danzer had directed Michel to mail the package, and the return address showed the sender to be "M. Pardue, General Delivery, Westville, Oklahoma 74965."

### Discussion

In almost ten years of doing this job this judge has not been faced with a case as troubling as this one or one that has caused this court as much concern, worry, and conflicting thoughts and emotions. On the one hand the court has in its very hands the future of a young twenty-year-old University of Arkansas student, Michel, and his 72–year-old grandfather. On the other side of the coin, the court must consider and protect the right of the citizenry to be free from the threat of dastardly criminal acts such as those planned in this instance.

For the reasons discussed below, the court has a great deal of concern about whether Michel and his grandfather really planned any of the matters that took place

or whether they were, instead, pulled along into this criminal act by the authorities much as someone is caught in a violent undertow at sea.

The court initially recognizes, as juries are often told, that emotions cannot play a part in legal proceedings, and the court has attempted to guard against letting the plight of Michel unduly affect the court's decision on the matter before it, but the court cannot escape the obvious which is that Michel is now a twenty-one-year-old University of Arkansas student,[2] and at least as far as the evidence shows, has no prior criminal record. Unfortunately, it has become obvious over the years that time served by young people in the penitentiary almost invariably teaches them nothing except how to become better criminals.

Also troubling to the court in this case is that, while it recognizes that law enforcement personnel must be free to vigorously and, indeed, creatively pursue criminals engaged in criminal activity, they must not be allowed to make crime or make criminals out of otherwise innocent citizens. Unlike large metropolitan areas, it is inevitable that the judges of the Western District of Arkansas will know and, in fact, become friends of law enforcement officers, including personnel in the U.S. Attorney's office, and this court's relationship in that respect is no exception. This judge is well-acquainted with many of the local authorities involved in this matter and, in fact, considers several of them to be personal friends. The court has no doubt about the integrity of these individuals and their good faith in pursuing the objectives pursued in this case, but, for the reasons discussed below, believes that, in their zeal to do their job of attempting to maintain law and order in this society, they stepped over the bounds of what is permissible and, at least as far as Michel Pardue and Jack Pardue are concerned, they made criminals out of them when they might otherwise not have become criminals.

---

**2.** The evidence indicates that Michel enrolled in the agriculture school at the University of Arkansas in September of 1990 before he was indicted and apparently before he had knowledge that he might be arrested for the occurrences that resulted in the indictment.

This court and its staff and supporting personnel and, indeed, law enforcement officials including staff members of the U.S. Attorney's office must never forget that, even though the court community is closeknit in this relatively rural area, this court is not and cannot become part of the prosecutorial arm of the system. Instead, it is a part of a separate and independent branch of government. One of its important functions is to stand between the "government" and the "governed" to insure that the rights of the citizens are protected in the adversarial atmosphere of criminal prosecutions. The system simply cannot allow the investigatory and prosecutorial part of the system to cross the line and make crime or criminals, and this court believes that any doubt in respect to whether that has occurred should be resolved in favor of the accused. As Voltaire said almost 250 years ago: "It is better to risk saving a guilty person than to condemn an innocent one." Voltaire, *Zadig* [1747], Ch. 6. As Sir William Blackstone [3] put it, "It is better that ten guilty persons escape than one innocent person suffer." W. Blackstone, *Commentaries* [1765–1769], Introduction.

While this court has little doubt but that Agent Gary Danzer in his dealings with Michel Pardue stepped far over the line delineating the border which this court believes to be proper, and while the court has a great deal of doubt that Michel Pardue and his grandfather would ever have become involved in this dastardly sequence of events without being dragged into it by Danzer, the court readily recognizes that there is a much closer question in respect to whether this court can, under the law, do anything about it. That is one of the aspects of this case that has been most troubling to the court. While the court is convinced that Michel Pardue should probably not go to jail and have his life forevermore ruined by what occurred or didn't occur in this case, the court recognizes that the entrapment issue was submitted to a jury and that the jury, after considering the evidence and considering proper instructions, including instructions on his entrapment defense, returned a verdict against all of the defendants. The court cannot substitute its judgment for that of the jury on the question of whether the defendants were entrapped.[4] The applicable standard is properly set forth in C. Wright, *Federal Practice & Procedure: Criminal 2d*, § 467 at p. 658 (1982), quoting from *Curley v. United States*, 160 F.2d 229 (D.C.Cir.), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), as follows:

If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration. But if a reasonable mind might fairly have a reasonable doubt or might fairly not have one, the case is for the jury, and the decision is for jurors to make. . . .

The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full pay to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reason-

---

**3.** Blackstone is, in the law at least, immortal. About him it was said: "He it was that first gave the law the air of science. He found it a skeleton, and clothed it with life, color and complexion; he embraced the cold statute, and by his touch it grew into youth, health, and beauty." B. Yelberton, Lord Avonmore [1736–1805] *On Blackstone.*

**4.** As to the outrageous conduct defense, the law appears to be that a determination of whether the conduct of the government agents during the investigation was so outrageous as to deprive the defendants of due process of law is a question of law to be determined by the court. *U.S. v. Simpson*, 813 F.2d 1462 (9th Cir.1987).

able doubt, is fairly possible, he must let the jury decide the matter.

Thus, this court cannot and does not desire to place itself above the jury and to disregard the jury verdict simply because it believes that the verdict was wrong. However, the system was designed by our ancestors so that judges, trained in the law, could properly consider whether reasonable minds could have found facts sufficient when combined with the law given by the court to find that the defendants are guilty beyond a reasonable doubt. The court's role in this respect given by Rule 29 is particularly important in this court's view in a case such as this one where the jury is asked to apply very technical entrapment standards. Fed.R.Crim.P. 29. One does not have to be an exceptionally scholarly lawyer to know that those concepts have given every court in the land, including the United States Supreme Court, considerable trouble in attempting to delineate the proper boundaries across which zealous law enforcement officers may not cross in pursuing citizens believed to have a criminal bent.

Both during the trial and in their motions, each of the defendants have asked that the court dismiss the matter or enter a judgment of acquittal because the conduct of the police officers in this case constituted, as a matter of law, entrapment, or they were denied due process because of the outrageous conduct of such officials. In the court's view, these defenses, raise exceptionally close questions, especially when viewed in the context of this court's role in ruling on Rule 29 motions.

### (a) *Entrapment Defense*

■ As has already been indicated, the entrapment defense in this country has been the subject of much debate and many conflicting court decisions. This court would not be able to better describe the defense and the elements of it than was done by Judge Floyd R. Gibson, Senior Circuit Judge, in the case of *United States v. Lard,* 734 F.2d 1290 (8th Cir.1984), so the court will take the liberty of quoting at length from that opinion. Judge Gibson wrote:

"The entrapment defense is based on the assumption that Congress did not intend to punish a defendant who had committed all the elements of a prescribed offense upon the inducement or instigation of government agents." *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973); *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958); *Sorrells v. United States,* 287 U.S. 435, 441, 452, 53 S.Ct. 210, 212, 216, 77 L.Ed. 413 (1932).

\* \* \* \* \* \*

However, the entrapment defense has no application where the government agents merely use stealth, strategy, or deception to trap an 'unwary criminal' or merely provide the defendant with an opportunity or facility to commit the crime. *Sherman,* 356 U.S. at 372, 78 S.Ct. at 821; *Sorrells,* 287 U.S. at 441, 53 S.Ct. at 212. Rather, '[i]t is only when the Government deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.' *United States v. Russell,* 411 U.S. 423, 436, 93 S.Ct. [1637] 1643, 1645 [36 L.Ed.2d 366] (1973); *Hampton v. United States,* 425 U.S. 484, 489, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976); *Sorrells,* 287 U.S. at 442, 53 S.Ct. at 212. As the court stated in *Sherman:* 'Entrapment occurs only when the criminal conduct was "the product of the *creative* activity" of law enforcement officials.... To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal.' *Id.,* 356 U.S. at 372, 78 S.Ct. at 821, *quoting Sorrells,* 287 U.S. at 441, 451, 53 S.Ct. at 212, 216.

*Lard,* 734 F.2d at 1292–93. *See also United States v. Shaw,* 570 F.2d 770 (8th Cir. 1978)

In *Lard* the court, in applying that standard, in words particularly appropriate to this case said:

Determining a defendant's predisposition requires examination of the defendant's personal background to see 'where he

sits on the continuum between the naive first offender and the streetwise habitue.' *United States v. Townsend,* 555 F.2d 152, 155 n. 3 (7th Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977). It also requires considering the extent to which the government agent has endeavored to instigate, importune, or induce the commission of the criminal act. *Id.; United States v. Borum,* 584 F.2d [424] at 427 [D.C.Cir.1978]; *United States v. Watson,* 489 F.2d 504, 511 (3rd Cir.1973).

*Lard,* 734 F.2d at 1293.

In *Lard,* after correctly setting forth the applicable law, the court found that the facts of that particular case showed that the defendant in that case was entrapped and that reasonable minds could not conclude otherwise. The defendants' conviction was reversed.

In this case, the court has little doubt that reasonable persons viewing the evidence could conclude that Michel Pardue and his grandfather, after having once become involved in this matter at the instigation of, and with the planning and direction of Gary Danzer, knew what they were doing and took substantial steps to carry out the plan. However, that does not answer the question of whether they were "entrapped" and what occurred is a good example of why trial courts, where an entrapment defense is used, should carefully view the evidence in combination with the law and determine whether the facts that the jury had a perfect right to find justify a conviction when the complex and difficult to understand law of entrapment is applied to those facts.

As the court said in *Lard,* in making that determination this court should determine where Michel Pardue "sits on the continuum between the naive first offender and the streetwise habitue." While this court in this closeknit legal community has heard "rumors" that law enforcement officials know more about the Pardues' past than this court knows, it goes without saying that this court must decide these motion on the evidence that it has before it. Often, law enforcement people have knowledge that the court and jury do not have because what they know is not admissible in a court of law often because, under the rules that have been developed over more than two centuries, it is believed that it is not reliable enough to be considered in determining the guilt or innocence of a citizen accused of a crime.

In respect to Michel Pardue, what this court knows is that when the events which are the subject matter of the indictment occurred, he was a twenty-year-old University of Arkansas student—a mere boy—with no prior criminal record or criminal activities. He was pitted against Gary Garrett, a career criminal whose only desire was to please the authorities and to entrap someone so that he could go free, and Gary Danzer, an FBI agent for over 21 years, who had frequently during his career posed as an undercover agent and, in fact, a hitman, willing to do anything for money.

The court recognizes that, as prosecuting attorneys invariably tell juries during closing arguments, they cannot be expected to deal with "choirboys" in matters such as these, and the court does not condemn them for using people like Garrett when that is necessary. However, the court believes that the law enforcement officials in this case should have recognized what they were dealing with and should not have allowed Garrett to play as significant a role in the planning of the activities that occurred in this matter as he appears to have played. One only needs to read the numerous letters that he wrote prosecuting attorney, Clinger, to see what the court means in this respect. It was obvious, or should have been obvious, that Garrett was only interested in doing whatever was necessary to get the authorities to help him, and that he was willing to say or do anything necessary to accomplish that.

It appears that he very quickly gained the confidence of David Pardue, also a career criminal, and someone who was certainly not above using whomever he could, including his son and father, to accomplish his purpose. In any event, after gaining Pardue's confidence, Garrett immediately

began to "worm" his way into the system to utilize it for his benefit. It appears from the letters that he very early obtained from David Pardue, in writing, a description of exactly what he wanted done, and the address of the Harringtons in Gentry written on a map of Arkansas, showing where Gentry could be located (government's Exhibit # 2). Additionally, Garrett obtained a rather good photocopy of a photograph of Harrington (government's Exhibit # 3) and he then began to write prosecutor Clinger numerous letters attempting to accomplish what he wanted accomplished—to be set free. It is obvious from the series of letters summarized above and introduced into evidence that Garrett played an important part in the planning of the activities that the authorities carried out in respect to this matter.

At some point, he gave the authorities the note, the address, the map, and the photocopy of the photographs discussed above. The court believes that that should have been enough for the authorities to have moved forward in the investigation of David Pardue, and, in fact to obtain sufficient evidence to convict him if that had been their desire. Apparently it was not their desire, or at least it was not their total desire. Perhaps that was because he was already in prison.

It also appears that Gary Garrett, the streetwise criminal, knew, that in order to accomplish what he desired, it might not be sufficient for him to simply hand the authorities David Pardue. In his first letter to prosecutor, Clinger, postmarked April 30, 1990, he says: "I have certain information and can get you enough evidence to convict David Pardue and *some family members* of a certain conspiracy charge." (emphasis supplied). There is no evidence in the record that indicates that, prior to that time, David Pardue had sought to involve any of his family members in his plot and the materials collected by Garrett and turned over to the authorities (government's Exhibits # 1, # 2, and # 3) do not indicate that they were to be in any way involved.

Then, shortly before the July 1, 1990, meeting at Cummins Prison between Danzer and David and Michel Pardue, Garrett, in his letter to Clinger postmarked June 28, 1990, as a result of his burning desire to help the authorities, advised Clinger that, "I might have come up with a way for your man to meet with the people you want him to meet." That letter was received by Clinger on June 29, and the court finds it significant that on July 1 Danzer had his meeting in the Varner Unit, apparently after it had been arranged by Garrett.

It is also obvious from a mere reading of the numerous letters which Garrett wrote that, about every time there was a lull in the proceedings, he would write a letter and say something in that letter that was designed to breathe new life into the investigation and cause the authorities to again move forward in an investigation that appears to have stalled or at least hesitated.

Then "Chuck Ross", Garrett's "cousin," and the cold-blooded hitman, appeared on the scene only two days after Garrett had advised Clinger that he could arrange for authorities to "meet with the people you want him to meet." It is obvious from Gary Danzer's testimony that he had a preconceived notion, mission and plan in respect to those meetings. At the start of his testimony he was asked by the U.S. Attorney: "What were you to do?" His response was: "I was to meet with David Pardue and Michel Pardue at a prison in Cummins, Arkansas." He was not to meet with just David Pardue even though everything that they should have had at that point indicated that David is the one that wanted the murder done, and government's Exhibit's # 1, # 2, and # 3 presumably in his possession should have been enough to continue the endeavor, if that had been his desire, without implicating Michel Pardue and his grandfather. The authorities obviously wanted to implicate those individuals at that point and were not satisfied with a conviction of David Pardue only who, after all, was already in prison.

What occurred at the meeting between Danzer, David and Michel gives the court the most concern. It is, in fact, the evi-

dence that causes this court to believe that Michel Pardue was entrapped into doing a series of criminal acts that he would not have otherwise done and which he had no intent to do prior to this meeting. It is this evidence which causes the court to believe and find that, when the law is properly applied to these facts, reasonable minds could not find otherwise.

Gary Danzer played his role well, so well, that the court believes that he exceeded the bounds of permissible police conduct. David Pardue, a career criminal with considerable experience, believed after the meeting that he was a cold-blooded killer willing to do anything for money. Playing that role to the hilt, according to his testimony, he told David that he might be able to help him with his problem and David told him that he wanted two people killed and, it appears from his testimony that David gave him a considerable amount of detail in respect to this endeavor. There is no indication whatsoever that Michel, although he was present, was to be in any way involved in the desired murders. Danzer did not indicate that Michel's name was even mentioned while he was talking with David about the murders.

In spite of that, and perhaps because of it, Danzer told David that he did not want to talk about it in the prison and, in effect, said to David and Michel that he would leave while they conspired together to kill the Harringtons and then invited Michel to come out and tell him about the conspiracy. By his actions, words, and conduct, he, in effect, said to this twenty-year-old young man: "Michel, conspire with your dad to kill the Harringtons, then come out to the parking lot and tell me about it."

There is no indication whatsoever that, prior to that time, Michel had planned to take any action in respect to it and, if he had committed any criminal act in merely knowing about it, it was certainly not the criminal acts with which he was charged and later convicted.

In any event, at Danzer's invitation and direction, it appears that David and Michel did discuss the murder of the Harringtons and in the court's view, because of that

invitation and direction, Michel was recruited to help carry out the endeavor. Undoubtedly out of blind, misplaced, and undeserved loyalty to his father, he agreed to become involved, and did become involved. However, the court believes that his agreement to become involved was not only at the invitation and direction of Danzer but before that time Michel had no criminal design or intent in respect to the matters that transpired. Danzer implanted into the mind of Michel the criminal intent, and the cases cited above hold that when that occurs the defendant has been entrapped and may not be convicted of a crime because of the acts that subsequently occurred.

As indicated above, Danzer carefully tape recorded all conversations that he had with Michel Pardue except the most important one which was the meeting in Cummins. He did not tape that conversation, he says, because the tape recorder did not work properly. All other meetings between Michel and Danzer were recorded, and anyone listening to those recordings would have to conclude that, from that point forward, Michel did no directing and planning of the endeavor. Instead, all plans and directions came from Danzer. In fact, as the court has already pointed out, during those meetings Danzer would rarely allow Michel to complete a thought before he was interrupted.

The facts set forth above describing the tape recordings and certainly the tape recordings themselves show that Danzer tried in almost every one of the conversations to make certain that he had also ensnared Jack Pardue, the grandfather, into the trap. He repeatedly said things or asked things that were intended to do that and tried valiantly, to no avail, to get the grandfather to meet with him, undoubtedly, so that he could cinch the case against Jack. More than once he said things to Michel about Jack Pardue such as, "Sounds like he's the man. Sounds like he's the one that's calling the shots to me. Sounds like you're in the middle." (9:30 p.m. meeting at Shoney's on July 2, 1990).

It is apparent from the recorded conversations that frequently when it appears

that Michel showed doubt about the murder plans, Danzer would make statements that were designed to be threatening to this twenty-year-old boy. When doubts were expressed, "Chuck" would say things that had to have been intended to strike fear into the heart of this twenty-year-old boy with whom he was dealing. He would explain that he had an associate on his way or already in Arkansas to help him commit the murders and indicated that this associate would be made if he wasn't paid. In the July 2, 1990, phone call after Michel advised him that both he and his grandfather thought it was "happening too fast", Danzer told Michel, that if his "help" was not paid "they're gonna want to kill me about the time I don't be able to come across with" the money.

In this same vein, at the close of the Shoney's meeting on July 2, 1990, when the deal, at least for that moment, had been called off, he, in the court's view, designedly told Michel that he was leaving the area because, "I got some people up in New Jersey that I want to see." That statement could have had no other intent but to convey to young Michel that he should be fearful of this criminal hitman. It is significant that he did not tell Michel that he was going to North Dakota or Nebraska to see some people or some other location that had not been in the news in recent years with mafia type criminal activity and highly publicized organized crime trials.

What transpired during a meeting between Michel Pardue and Gary Danzer on July 2, 1990, at Shoney's in Fayetteville, and the course that this matter took after that meeting is especially troubling to the court and the court submits should be troubling to anyone who is concerned that only guilty people are convicted of crimes. That meeting was arranged by Danzer for the purpose of meeting "grandpa" ostensibly for the purpose of having Jack Pardue show him the money so that he would know it was available. Obviously, this was another attempt by Danzer to make certain that grandpa was also in his trap. Jack Pardue did not attend the meeting, and it is obvious from the tape recording of the meeting that Pardue quickly made it

known that neither he nor his grandfather were comfortable with the matter going forward immediately as he was led to believe Danzer desired it to be. Danzer insisted that he understood that the killing was to take place by the 8th of July.

Michel first told Danzer that neither he nor his grandfather were happy with their alibis and were not ready for the murders to take place. Danzer implored him to go forward and said things like, "I don't know how much better alibi you think you need other than maybe you're out of town." When Danzer insisted, Michel agreed to check with his grandfather who was apparently in the parking lot of the shopping mall area near Shoney's. He appeared to have left the meeting and, presumably after consulting with his grandfather, returned to advise that his grandfather would not agree to meet with Danzer. It was then that Michel told Danzer that the matter was moving too fast for both him and his grandfather and that they did not want the murders to take place, at least not immediately, as Danzer seemed to insist. It was near the close of that meeting that Michel was threatened with the hitman who Danzer had coming over who might want to kill Danzer and, inferentially at least, Michel.

Near the end of the conversation, it seemed to be understood that the murders would not take place in the near future and it was understood that Danzer would go wherever he intended to go. He made certain that Michel understood that he might not be available when they wanted him and that they would have to try to get in touch with him through Gary Garrett. Danzer made it clear that he might not be able to come when they wanted him. Michel agreed that that was acceptable and they said their goodbyes and apparently went to their vehicles located in the Shoney's parking lot. As they are at or in their separate vehicles preparing to leave the area, Danzer, apparently unwilling to allow Michel and his grandfather to wiggle free from the net, called Michel and advised him that he would call him in about a week. It was after that statement was

made that Danzer used the "going to New Jersey" threat described above.

As promised, Danzer called Michel on July 8 and tried to breathe new life into the venture. By questions asked, Danzer obviously tried to encourage Pardue to talk with his father about the venture and Pardue seemed to agree that either he or his grandfather would attempt to do so. Again, however, it is obvious that Michel was not pushing for the deed to be carried out and things were left pretty much as they had been at the close of the July 2 meeting.

The court finds what occurred after the July 2 meeting and the July 8 telephone conversation in respect to Michel Pardue and his grandfather to be particularly abhorrent. Anyone engaged in those conversations or listening to the tape of them must conclude that it is obvious that Michel and his grandfather were at the very least having second thoughts about the venture and certainly did not want it to go forward, at least not then. The evidence shows that nothing occurred in respect to Michel being involved in the plan between those dates and September 16, 1990, and Michel had no input into what occurred then and no apparent knowledge of what was occurring. The authorities, obviously with knowledge that the matter had stalled, wrote a letter to Garrett on July 31, 1991 (government's Exhibit # 26) in an obvious attempt to breathe new life into the plan that was at least near death.

From the evidence, it appears that the only thing that occurred between July 8 and the letter written by the authorities on July 31 which might have prompted that action by the government is a letter from the government's paid or at least rewarded agent, Garrett, received by prosecutor Clinger on July 11, imploring the government to do what he apparently believed they had promised to do for him and advising them that he had put himself and his family in danger because of his cooperation.

The July 31, letter written by the authorities was purportedly from "Chuck" and on August 6, 1991, "Chuck" received an envelope with a return address for Gary Garrett (government's Exhibit # 27) containing a letter which was purportedly signed by both Garrett and David Pardue. David Pardue disputed that he had signed the letter, but that was certainly a question for the jury. In any event, because of what transpired afterwards, the court finds that that letter is a significant piece of evidence to be considered by the court in ruling on these motions, and because of its importance, the court is attaching a copy of it as Exhibit "B" to this opinion.

The court believes that it is obvious from a mere reading of this letter that all that it purports to do is to reply to the July 31 letter written by the government to Garrett. It merely sets forth what Pardue (if he wrote it) claims the deal was and does not, in any manner urge that the deed immediately be done or that it be done at all. It merely says that the deal was that "Chuck" would be paid when the murders were committed.

In spite of that, Gary Garrett wrote three more letters received August 22, and September 19, in which he makes claims about how Pardue is bugging him about the murders not having been committed as agreed and he advises the authorities that Pardue is insisting that others will be contacted to commit the murders or that he will expect Garrett to commit them if "Chuck" does not do so.

Of course the court has no way of knowing what motivated government agents in doing what occurred starting on September 16, but it is certainly possible and perhaps probable that these claims by Garrett caused the agents to act as they did. They must have believed, if they took Garrett's letters at face value, that they must act to stop the imminent murders of the Harringtons. Garrett's letters were certainly intended to convey that impression.

The letter that they received, purportedly from David Pardue, did not convey that same sense of urgency. It appears that the desire that the murders take place by July 8 or 9 had been prompted by a scheduled trial of David on the Benton County perjury charges in which Harrington was

expected to testify. By the time in early August when David's letter to "Chuck" was written the urgency of committing the murders, and perhaps some of the need for them had passed because, on July 10, David Pardue had pled guilty to the perjury charges and had been sentenced to an additional seven years in prison.

In any event, for whatever reason, and without any input from or knowledge of Michel Pardue, he received a call from "Chuck" out of the clear blue on September 16, 1990, almost two and one-half months after Pardue had last heard from Danzer when it was made known that neither Michel or his grandfather were ready for the murders to take place. This call was made even though the authorities knew at that point that David Pardue had directed them, through Garrett, not to contact his family about anything. Danzer spoke with a sense of urgency and advised Michel that he had been in contact with Michel's father and that "this thing is going to go down the 18th, late at night, or early in the morning of the 19th. You and your grandpa better get your alibis set." When he asked Michel whether he had seen his father, Michel replied that he had seen him that very day and that his father had said nothing to him about the murders. He told Michel that David Pardue was pushing him and that he was going to do the murders as David insisted. Michel was not given a chance to express any of his thoughts or to either accept or decline to be involved further. Danzer ended the conversation by simply telling him that he would contact Michel, probably on the 20th.

Then, at 6:30 a.m. on the 20th Danzer called Michel and, in a very short conversation, in effect directed that Michel meet him at Shoney's that night. Pertinent portions of that tape recorded telephone conversations are set forth in the "facts" section of this opinion. As indicated, Michel told "Chuck" that he had not intended to meet with him, "but I guess its too late now", obviously meaning that now that the Harringtons had been killed, he had no choice but to complete the transaction.

They met at Shoney's that night and that conversation is also described above. After that meeting, Michel and his grandfather visited David in the prison and reported to him what Michel had seen. The remaining portion of the money owed the "hitman" was then mailed as described above, and Michel and Jack Pardue were subsequently indicted, arrested and convicted.

Based on the above facts which are largely uncontroverted, the court is convinced that FBI Agent Gary Danzer and the government's agent, Gary Garrett, working together, by deception and improper conduct implanted the criminal design and intent in the otherwise innocent mind of this young man. That occurred at the time of and immediately after the meeting at the Varner Unit and, since that is true, as a matter of law it makes no difference whether Michel later willingly or unwillingly assisted the plan to go forward.

It appears that it is probable that, after Danzer recruited and enlisted him into the plan, Michel, out of blind, misplaced and undeserved loyalty to his father, did some things and made some statements that indicate his guilt. The court believes that it is probable that it was those matters that caused this lay jury, untrained in the law, to reach the verdict that it did, and believes that it is expecting too much to expect a lay jury to recognize that the entrapment defense requires determination to be made about whether the subsequent activities of the accused took place because the individual was predisposed to commit the crime or because the idea for the crime was improperly planted in his mind. The court finds, as a matter of law, that, when the law is properly applied to the uncontested facts, Michel Pardue was entrapped as that defense is described in the law, and that reasonable minds could not conclude otherwise.

■ The evidence shows that Jack Pardue did not participate in any of this plan except to aid his entrapped grandson in carrying out what had been largely directed by Gary Danzer. There is also no indication from the evidence that there was

any intent for Jack Pardue to become involved until Gary Danzer set out to make him become involved through the various artifices employed by him described above. In short, if Jack Pardue had any intent to commit the crimes for which he was convicted, that intent was also placed in his mind by the actions of Danzer utilizing Michel. Thus, the court finds that Jack Pardue was also entrapped as a matter of law.

It is an entirely different story as to David Pardue. As the court has already indicated, the record reflects that he, unlike his father and son, was an experienced career criminal, knowledgeable about the ways of crime. Long before Gary Danzer appeared on the scene, he had discussed the possible murder of the Harringtons with at least four other people, and there is no evidence to support his contention that he was similarly entrapped.

### (b) *Outrageous Conduct*

■ The *Lard* case also discusses to some extent the defense of outrageous conduct and found that the conduct of the agents in that case at least bordered on conduct "so outrageous that due process principles should bar the government from invoking judicial processes to obtain a conviction." *Lard, supra, citing United States v. Russell,* 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973).[5] This possible defense first saw the light of day in dictum in an opinion written by Justice Rehnquist in *United States v. Russell,* 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973). The cases cited in footnote 5 below have placed flesh on the bones of an outrageous conduct defense suggested by this dictum and generally

hold that the defense may apply where the conduct of law enforcement officers is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977). Later, in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), five members of the Supreme Court suggested in concurring and dissenting opinions that convictions resulting from such outrageous conduct might be vacated by use of the court's supervisory powers.

■ Irrespective of which method is used by the court to right a wrong caused by such improper conduct on the part of law enforcement officers, the court is not bound, when considering a Rule 29 motion, by the same strictures as in considering an entrapment defense. In deciding to vacate a conviction on due process grounds or by utilizing the court's supervisory powers, the court is deciding a question of law which was not and could not have been submitted to the jury.[6]

This court recognizes that the war on crime which is being waged in this country is an important one with high stakes, but every person concerned with freedom and justice should recognize that, as in most wars, innocent persons are sometimes irreparably harmed. The fact is that no murder took place in this case and the court has a great deal of doubt that one ever would have even if the government agents, including Gary Garrett, had not become involved. It is likely, as some of the witnesses testified, that prisoners usually believe they want to do harm to

---

**5.** For other cases discussing the "outrageous conduct" defense or reversing convictions for similar improper conduct of government agents, *see Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Williams,* 791 F.2d 1383 (9th Cir.1986); *United States v. Bogart,* 783 F.2d 1428 (9th Cir.1986), *vacated,* 790 F.2d 802 (9th Cir.1986); *United States v. Twigg,* 588 F.2d 373 (3rd Cir.1978); *United States v. West,* 511 F.2d 1083 (3rd Cir. 1975); *Greene v. United States,* 454 F.2d 783 (9th Cir.1971); *United States v. Gardner,* 658 F.Supp. 1573 (W.D.Pa.1987); *United States v. Batres–Santolino,* 521 F.Supp. 744 (N.D.Cal.1981); *Unit-*

*ed States v. Valdovinois–Valdovinois,* 588 F.Supp. 551 (N.D.Cal.1984), *rev'd on other grounds,* 743 F.2d 1436 (9th Cir.1984).

**6.** Interestingly, the standard of review may be drastically different. In footnote 2 of *United States v. Simpson,* supra at 1465, the court said that the reviewing court should consider the action of the trial court where the due process defense was utilized *de novo,* but that action taken by the trial court using its supervisory powers should be reviewed using the "abuse of discretion" standard.

whomever they believe put them there. Like small boys trying to be tough, they talk about doing that. That may be all that occurred in this case, and it might very well be that it would have gone no further than that had Gary Garrett not seized upon the opportunity to attempt to gain his freedom by handing the Pardues to the authorities on a silver platter. Unquestionably, in this court's view, the acts of this paid, rewarded, or at least expected to be rewarded government agent, in conjunction with the overzealous activities and conduct of Gary Danzer described above, was outrageous conduct when considered as a whole, which deprived Michel Pardue and Jack Pardue of due process guaranteed to them by our Constitution.

The court believes that anyone who listens to all of the tape recorded contacts that Danzer had with Michel Pardue would find themselves compelled to believe that it was simply not fair and, in fact, outrageous conduct for this experienced FBI agent, posing as a dangerous killer, to plan and direct, as he obviously did, the illegal activities which Michel Pardue found himself caught up in after becoming involved when he was recruited at the July 1st Varner Unit visit, and for him to threaten Michel Pardue when it appeared that he might be wavering or faltering in moving toward the goal established for him.

The September 16 telephone call and the meeting on September 20 were planned and carried out by the authorities after Michel had made it clear in the July 2 meeting that both he and his grandfather were at least having second thoughts about the murders and didn't want them committed, at least not then, and after Garrett had been told that "his people" were not to contact Michel or his grandfather again. In spite of that, the murders were faked two months after the July 2 meeting and the September 16 telephone call and the September 20 meeting were arranged for, planned and dictated by Danzer two and one half months after he had last had any contact with Michel. Anyone listening to the tape recordings made by Danzer on those two occasions would be compelled to recognize that Danzer made certain that Michel had

no chance to have any voice or input in the plan. Michel was told, in no uncertain terms, to listen and do as he was told. On September 16 he was told that the murders would take place on the 18th or the 19th and that Danzer would call him so they could meet for Michel to be shown the evidence. Then on the 20th he was shown the pictures and told to get and mail to "Chuck" at an address in Oklahoma the balance of the contract price.

Thus, Michel and Jack Pardue were placed in the position, they must have believed, of either paying the money for the murders that had already been committed by Chuck and his help, or face the wrath of this man with friends in New Jersey who was willing to kill a man and woman, and perhaps a small child, for $4500 and who made his living killing people for money. That is not fair. That is not right. That is outrageous. The court believes that fairness and justice demands that this wrong be righted and the court finds that the improper conduct of law enforcement officers and their agents deprived Michel and Jack Pardue of due process of law guaranteed by the Constitution. The court also believes that justice demands that the court use its inherent supervisory power to remedy this injustice, and the court will vacate the convictions of Michel and Jack on that additional ground.

*Conclusion*

For the reasons set forth above, the court finds that the motions for judgment of acquittal filed in behalf of Michel Pardue and Jack Pardue should be granted and that a judgment of acquittal should be entered in their favor on all charges for which they were convicted.

As to David Pardue, there was ample evidence for the jury to have found as it did in respect to this defendant who not only clearly set out to solicit the murders of the Harringtons, but who inexplicably and despicably allowed his twenty-year-old son and his seventy-two year old father to become involved in the crime. Whether David Pardue, without the aid of the government agents, would have ever been

able to complete the crime that he set in motion is not important. There is little question that he did and intended to do what the jury found him guilty of doing so his motion for judgment of acquittal will be denied.

EXHIBIT A

AUG 22 1990

Dear Sir!

How are things going. Did you ever get the letter that was sent to Chuck Rose. The last time I talked to mr Jones you'll hadn't received it yet. Pardue keeps bugging me every time he sees me. Wanting to know if I've heard from my cousin or not. Keeps wanting to know if he's going to do the job or not. If not He wants me to pay him his 500 dollars back.

Also I was wondering if you would get ahold of me personly and let me know how things are going on getting me out. I would really appreciate it very much being able to talk to you as soon as possible. If it is going to take much longer I would like to go onto Sevier County or out 3-9 will you come get me out.

Sincerly your's
Roy Garrett

GOVERNMENT
EXHIBIT
28

USA
25

LITTLE ROCK, AR 722
PM 20 AUG 1990

David Clinger
Benton County Courthouse
100 NorthEast A. Street
Bentonville, Ark.

D. Barnett
A.D.C. #71486
P.O. Box 600
Grannis, Unit
busy cut. 716446600

EXHIBIT B

GOVERNMENT
EXHIBIT
27

The understanding I had was that 500⁰⁰ down and the rest when the job was done, That the money would be sent to a Post Office Box or where ever you wanted it sent, this is the Way I told my Boy

That Way They don't have to be any Contact after the job.

My Boy Was leary of Being the money before the job was done, because this was not in the agreement, you and I had agreed that the money would be sent to an P.O. Box of your Choosing, As soon as you notify one of us of the address, no more money will be payed until the job is done, the money will be payed you have Mine and Gary Word on it.

my address is the same Hwy
David Pardue 93335
P.O. Box 600 Blhs 14

David
p.s. pardue is good for the money or I wouldn't be in on this. you have my word on it.
sing

DO NOT TOUCH

LATENT FINGERPRINT EVIDENCE

USA

25