958 F.2d 806
 UNITED STATES of America, Appellee,
v.
Charles David ASKEW, Appellant.
UNITED STATES of America, Appellee,
v.
Tommy Earl EDWARDS, Appellant.
UNITED STATES of America, Appellee,
v.
Leland O'Grady GLASCO, Appellant.
UNITED STATES of America, Appellee,
v.
Thomas Lee EDWARDS, Appellant.
 Nos. 90-2714, 90-2898, 90-3013 and 91-1531.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 9, 1991.
Decided March 5, 1992.
Rehearing Denied in No. 90-2714
April 23, 1992.
 
 Dan J. Kroha, Little Rock, Ark., argued, for Charles David Askew.
 Dale E. Adams, Little Rock, Ark., argued, for Tommy Earl Edwards and Thomas Lee Edwards.
 Don Ed Payne, Hugo, Okl., argued, for Leland Glasco.
 Counsel Robert Joseph Govar, Asst. U.S. Atty., Charles A. Banks, U.S. Atty., Little Rock, Ark., argued, for U.S.
 Before BOWMAN, WOLLMAN, and LOKEN, Circuit Judges.
 LOKEN, Circuit Judge.
 
 
 1
 Leland Glasco, Tommy Earl Edwards, Thomas Lee Edwards, and Charles David Askew appeal both their convictions and sentences for participating in a multistate conspiracy to manufacture and distribute methamphetamine. We affirm.
 
 I.
 
 2
 In the fall of 1984, at a meeting in North Little Rock, Arkansas, Tony Givens, a convicted felon and former drug addict, and Anthony and Leland Glasco, California residents with long family roots in Arkansas, decided there was a market for methamphetamine in the Little Rock area. Anthony Glasco, the dominant figure in the resulting conspiracy, agreed to produce the methamphetamine; Givens would help distribute it in Arkansas. According to the government, the conspiracy ultimately spanned seven states, involved dozens of individuals, and produced and distributed 251 pounds of crystal methamphetamine.
 
 
 3
 The first 100 pounds were produced at a makeshift laboratory in Daisy, Oklahoma, in the spring and summer of 1985. The lab participants packaged the drug in large food cans bearing pork and bean labels. Testimony linked at least eight people with this lab, including Leland Glasco. Each participant received some of the drug when leaving.
 
 
 4
 The remaining 150 pounds were produced at four "speed labs"[1] that operated out of an abandoned trailer home on Tommy Earl Edwards' (Edwards Sr.) 240-acre hay and cattle farm in Frenchglen, Oregon, from early summer 1986 until February or March of 1987. In Oregon, the finished product was put into plastic baggies, rather than food cans, and again divided according to each participant's stake in the venture. The lion's share, at least from the Oregon labs, went to Anthony Glasco and Edwards Sr.
 
 
 5
 A number of witnesses testified that they flew to Modesto, California, or Reno, Nevada, to pick up methamphetamine from the Glascos. They paid in cash or equipment, or were "fronted" the drug to sell on consignment. When they returned to Arkansas, Kansas, or Oklahoma, they would sell smaller quantities to other dealers. Another witness testified that he obtained methamphetamine by phoning one of the Glascos and then picking up a pound of the drug from their mother, Dorotha, at her Arkansas home.
 
 
 6
 In April 1990, appellants and eleven others were charged in a one-count indictment with violating the federal drug conspiracy statute, 21 U.S.C. § 846, by participating in a single conspiracy to manufacture and distribute methamphetamine from January 1985 to January 1989. Appellants were separately tried; some of their alleged conspirators, including Anthony Glasco, await trial. Others not named in the indictment, including Givens, have been convicted of related offenses.
 
 
 7
 Many of the alleged conspirators were family members. For example, the indictment named (i) Dorotha Glasco and Edwards Sr., who are siblings; (ii) their children, Leland and Anthony Glasco, Paul Steven Edwards, and Thomas Earl Edwards (Edwards Jr.); and (iii) their nephew, Michael Edwards. In addition, Michael's father, Felix Edwards, testified at the trial after a related conviction, and Michael's brother, Ricky, was a key government witness.
 
 
 8
 Appellants were convicted in June 1990 after a nine-day jury trial. Leland Glasco disappeared before the seventh day of trial and was convicted in absentia. He was then rearrested and cooperated in the government's efforts to apprehend others, including his brother Anthony. Following the verdict, each defendant moved for post-trial relief on various grounds, most of which are presented on appeal. The district court[2] denied these motions and sentenced defendants to prison terms ranging from 60 to 235 months. These consolidated appeals followed.
 
 II.
 
 9
 Single or Multiple Conspiracies.
 
 
 10
 Glasco, Askew, and Edwards Sr. argue that the indictment alleged a single conspiracy, but the government proved multiple conspiracies, because the evidence did not sufficiently link the manufacturing in Oregon with the manufacturing in Oklahoma or with the distribution in Arkansas and elsewhere. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Appellants allege that this variance in proof is grounds for reversal because their substantial rights were prejudiced by the "spillover" of evidence from one conspiracy to another. See United States v. Jones, 880 F.2d 55, 65-66 (8th Cir.1989).
 
 
 11
 Before trial, defendants raised a critical aspect of this issue--whether hearsay statements would be admissible against each defendant as conspirator statements under Fed.R.Evid. 801(d)(2)(E).[3] Adopting the procedure we approved in United States v. Bell, 573 F.2d 1040, 1044 (8th Cir.1978), the district court conditionally admitted conspirator statements during the government's case, subject to defendants' objections. When the government rested, defendants renewed their objections and moved for a mistrial on the ground that the government had failed to prove the single conspiracy alleged in the indictment. The district court overruled the objections, concluding that almost all the conspirator statements were admissible against all defendants because "this was one large conspiracy and not a group of separate conspiracies."
 
 
 12
 The district court also properly submitted the single conspiracy issue to the jury, instructing that, to convict, the jury must find beyond a reasonable doubt "that the conspiracy alleged in the indictment was willfully formed."[4] The question whether there was more than one conspiracy is ultimately for the jury. Our review of the jury's determination of this question is exceedingly limited:
 
 
 13
 If the record contains evidence from which the jury could find one overall agreement to commit an illegal act, the evidence establishes a single conspiracy.
 
 
 14
 United States v. Regan, 940 F.2d 1134, 1135 (8th Cir.1991); see United States v. Massa, 740 F.2d 629, 636-37 (8th Cir.1984), cert. denied, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). Viewing the evidence in the light most favorable to the jury, as we must, we find ample evidence supporting the jury's verdict. See United States v. Lee, 782 F.2d 133 (8th Cir.1986).
 
 
 15
 There was testimony connecting those manufacturing the drug at both locations with those who distributed it throughout the conspiracy period. There was substantial evidence that this drug ring was a family affair, in which family members had various roles but were aware of the common goal. "A division of labor among conspirators in pursuit of a common goal does not necessitate a finding of discrete schemes." United States v. Gomberg, 715 F.2d 843, 846 (3d Cir.1983), cert. denied, 465 U.S. 1078, 104 S.Ct. 1439, 1440, 79 L.Ed.2d 760 (1984). Also, there may be a single conspiracy when a single member, such as Anthony Glasco, dominates, so long as the lesser players work toward the common goal. See United States v. Gonzalez, 940 F.2d 1413, 1422 (11th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 910, 116 L.Ed.2d 810 (1992).
 
 
 16
 Therefore, on this record we conclude, first, that there was sufficient evidence for the jury to find a single conspiracy, and second, that appellants have failed to show that their substantial rights were prejudiced by any variance because of the district court's proper handling of the conspirator statements issue.
 
 
 17
 Sufficiency of the Evidence.
 
 
 18
 Askew and Edwards Jr. argue that there was insufficient evidence to convict them of conspiracy. This issue requires us to determine whether, viewing the evidence in the light most favorable to the government, there was substantial evidence that each of these defendants was a conspirator:
 
 
 19
 To be guilty of conspiracy, one must knowingly contribute to the furtherance of the conspiracy. Knowing contribution requires some element of cooperation beyond mere knowledge of the existence of the conspiracy. An agreement may include the performance of many transactions, and new parties may join or old parties terminate their relationship with the conspiracy at any time. "Once the existence of a conspiracy has been established, even slight evidence connecting a particular defendant to the conspiracy may constitute proof of the defendant's involvement in the scheme to render him culpable." The government need not prove that the defendant knew all the conspirators or was aware of all the details.
 
 
 20
 United States v. Garcia, 785 F.2d 214, 225 (8th Cir.) (citations omitted), cert. denied, 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986); see United States v. Foote, 898 F.2d 659, 663 (8th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 112, 112 L.Ed.2d 81 (1990).
 
 
 21
 There was substantial evidence that Askew knowingly joined the conspiracy. Witness Richard Sharp testified that he met Askew while in California buying methamphetamine from Leland Glasco. On one such trip, while driving Sharp to the train station, "David Askew told me something was under the seat.... I picked up a baby powder container from under the seat of the truck." Sharp later checked and found a pound of methamphetamine in the container.
 
 
 22
 Witness Ronald Hopkins testified that, during a drug-buying trip to Leland Glasco's home in California, a man living in the house named David emptied a plastic baby powder container, filled it with methamphetamine, and handed it to Hopkins. While testifying in his own defense, Askew admitted that he lived with Leland Glasco for about a year during this period. In light of this incriminating testimony, we must leave the jury's verdict against Askew undisturbed. See United States v. Williams, 897 F.2d 1430, 1432 (8th Cir.1990).
 
 
 23
 The evidence against Edwards Jr. was thinner--he is mentioned only twice in 1,500 pages of testimony. First, his cousin Ricky testified that Edwards Jr. visited one of the speed labs on his father's property in Oregon while it was in operation:
 
 
 24
 Q. Were there any visitors to this lab while you were there?
 
 
 25
 A. Tom, Jr. come down one time. He had somebody with him.... Tom just walked into the trailer and we had just very few words and then he walked to the lab and then he left.
 
 
 26
 Second, witness Michael Ballard testified that Anthony Glasco instructed him to take two small sections of PVC piping, capped at both ends, to the parking lot of a motel in Jacksonville, Arkansas, and exchange them for a shotgun and a large wooden bird cage for Leland Glasco. It was Edwards Jr. who met Ballard and made the exchange. Though the two did not discuss drugs or money, there was substantial other testimony that the drug ring often stored drugs and money inside PVC pipes. The motel records confirmed that Edwards Jr. was there that day, and the fact that he was a California resident in Arkansas to make such an exchange is certainly evidence that he was a courier of some sort. Thus, we agree with the district court's decisions to submit the case against Edwards Jr. to the jury and to sustain the jury's verdict.
 
 
 27
 Sentencing Issues.
 
 
 28
 A. Glasco argues that the district court improperly punished him for exercising his constitutional right to trial when it rejected the recommendation that he receive a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. The PSR recommended this reduction because, after his mid-trial flight, Glasco admitted his role in the drug ring and helped the government in its continuing investigation.
 
 
 29
 At Glasco's preliminary sentencing hearing, the district court commented:
 
 
 30
 I never understood what's the value of giving acceptance of responsibility for a person who waits to see if they are convicted and then decides whether they accept responsibility. Sort of a strange quirk.
 
 
 31
 At the second hearing nearly two months later, the district court set Glasco's offense level at 32, added a two-level increase for obstructing justice for his flight during trial, U.S.S.G. § 3C1.1, and denied the two-level reduction for acceptance of responsibility. Noting that any acceptance of responsibility was untimely because it did not occur until after Glasco was convicted in absentia after fleeing his trial,[5] the district court determined that this was not an "extraordinary case" in which a defendant both obstructs justice and accepts responsibility. See U.S.S.G. § 3E1.1, comment. (n. 4); see United States v. Paige, 923 F.2d 112, 114 (8th Cir.1991).
 
 
 32
 Giving the district court's determination "great deference," as we must, see U.S.S.G. § 3E1.1, comment. (n. 5), we conclude that its denial of this reduction was not clearly erroneous. See United States v. Laird, 948 F.2d 444 (8th Cir.1991). The district court's explanation of why it denied the reduction was appropriate under the Guidelines and demonstrated that Glasco was not punished for exercising his right to a trial. In addition, we note that Glasco was amply rewarded for cooperating with the authorities after his post-trial arrest. Pursuant to the government's downward departure motion under U.S.S.G. § 5K1.1, the district court sentenced Glasco to 140 months in prison, well below his guideline range of 151-188 months and a full three years below the sentence the district court would normally have imposed. Moreover, the government did not prosecute Glasco for fleeing during his trial.
 
 
 33
 B. Askew challenges the ten-year mandatory minimum sentence imposed under 21 U.S.C. § 841(b)(1)(A)(viii) for the manufacture or distribution of 100 grams or more of methamphetamine.[6] Citing Bifulco v. United States, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), Askew argues that his drug conspiracy conviction should not be subject to the mandatory minimum sentence applicable to the underlying substantive offense. This argument is without merit, however, because the drug conspiracy statute, 21 U.S.C. § 846, has been amended since Bifulco to expressly provide that convicted drug conspirators are "subject to the same penalties as those prescribed for the [underlying substantive] offense." Thus, the mandatory minimum sentence was properly imposed.[7]
 
 
 34
 Askew also argues that the disparity between the sentence he received, and the sentences received by conspirators who were equally or more culpable, violated his due process and equal protection rights. However, the case upon which he relies, United States v. Redondo-Lemos, 955 F.2d 1296 (9th Cir.1992), is clearly distinguishable and of doubtful force in this circuit. At Askew's sentencing hearing, the prosecutor explained that conspirators who were prosecuted earlier in the investigation had received shorter sentences because the government was then unaware of the conspiracy's magnitude. Thus, even if Askew has raised a tenable due process or equal protection issue, the record provides no basis for overturning his sentence on these grounds.
 
 
 35
 C. The district court sentenced Edwards Sr. to 235 months, the minimum term under his guideline range. He objects to being sentenced under the Guidelines, arguing that he withdrew from the conspiracy prior to November 1, 1987, their effective date.
 
 
 36
 Though the Guidelines apply to "straddle" conspiracies that begin before and terminate after Nov. 1, 1987, a defendant may avoid a guidelines sentence by proving that he withdrew from the conspiracy prior to that date. United States v. Lee, 886 F.2d 998, 1003 (8th Cir.1989), cert. denied, 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990). However, he must do more than show no conspiracy activity on his part after the cut-off date; he has the burden of showing that he affirmatively disavowed the conspiracy, "either [by] making a clean breast to the authorities or [by] communicating his withdrawal in a manner reasonably calculated to reach co-conspirators." United States v. Boyd, 610 F.2d 521, 528 (8th Cir.1979), cert. denied, 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980); United States v. Lewis, 759 F.2d 1316 (8th Cir.), cert. denied, 474 U.S. 994, 106 S.Ct. 406, 407, 88 L.Ed.2d 357 (1985).
 
 
 37
 Edwards Sr. did not raise this issue at his sentencing, and it is no doubt waived. In any event, it is without merit. Ricky Edwards testified at trial that Edwards Sr. sold his Oregon farm equipment and livestock and moved to Arkansas in September 1987 because the local authorities were on his trail, and he was concerned the federal government would seize his assets. Ricky Edwards also testified that he and his uncle buried the drug lab equipment on the Oregon property, and that Edwards Sr. later said that he had dug up the equipment and burned it. These are not acts of affirmative withdrawal; they were designed to thwart the authorities and probably made it more likely the conspiracy would continue. Moreover, there was testimony that Edwards Sr. continued as a conspirator after moving to Arkansas--he drove his brother Felix to a meeting with Anthony Glasco at which Anthony threatened to kill Felix if he cooperated with the police. On this record, it is clear that the district court did not err in determining Edwards Sr.'s sentence under the Guidelines.
 
 
 38
 Other Issues.
 
 
 39
 Appellants' remaining arguments require little discussion. Askew and both Edwards argue that they were prejudiced by Glasco's flight on the seventh day of trial, that the district court's cautionary instruction did not cure the prejudice, and therefore that they deserve a new trial. These defendants made no mistrial motion when Glasco failed to appear; they also failed to preserve their complaint about the district court's cautionary instruction.[8] Because they may have hoped that the jury would infer innocence from their willingness to wait out the verdict, their failure to make a timely record waives these issues. Cf. United States v. Lemm, 680 F.2d 1193, 1205 (8th Cir.1982), cert. denied, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983).
 
 
 40
 Askew also argues that he deserves a new trial because the prosecutor did not timely disclose an adverse witness. The trial began on June 18, 1990. Prior to June 14, it appeared from discovery materials produced by the government that Richard Sharp would be the only witness who would directly implicate Askew. On June 14, Hopkins pleaded guilty to a related offense and agreed to cooperate with the government in this case. The prosecutor then notified Askew's counsel that Hopkins would be a witness and would probably identify Askew.
 
 
 41
 The district court denied Askew's motion for a continuance on the first day of trial but reserved its ruling on whether Hopkins could testify until the sixth day of trial, after Hopkins had been interviewed by defense counsel. Finding no prosecutorial misconduct in the late disclosure of this witness, and based upon defense counsel's candid admission that he had had an adequate opportunity to interview Hopkins, the district court then permitted Hopkins to testify.
 
 
 42
 Rulings of this nature are committed to the district court's discretion; we find no abuse of that discretion here. Compare United States v. Heine, 920 F.2d 552, 555 (8th Cir.1990) (continuance); United States v. Lanier, 838 F.2d 281, 285 (8th Cir.1988) (new trial).
 
 
 43
 The judgments of the district court are affirmed.
 
 
 
 [1]
 "Speed lab" is the name given to each multiweek session when methamphetamine is cooked, dried, and packaged
 
 
 [2]
 The HONORABLE STEPHEN M. REASONER, Chief Judge, United States District Court for the Eastern District of Arkansas
 
 
 [3]
 The statement of a conspirator is admissible if (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement was made during the course and in furtherance of the conspiracy. United States v. Hoelscher, 914 F.2d 1527, 1539 (8th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 971, 112 L.Ed.2d 1057 (1991). Admissibility is a question for the court, Fed.R.Evid. 104(a); the government must prove that a conspirator statement is admissible by a preponderance of the evidence. Bourjaily v. United States, 483 U.S. 171, 176, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987)
 
 
 [4]
 At defendants' request, the district court also instructed the jury that it could find separate conspiracies relating to the Oklahoma and the Oregon labs, so long as it did not attribute conspirator statements across conspiracy lines. Glasco argues on appeal that this instruction compounded the multiple conspiracy problem. If so, that was obviously defendants' own doing. There was no objection to any of the conspiracy instructions. "We apply the plain error rule to jury instructions only when necessary to prevent a miscarriage of justice." United States v. Mason, 902 F.2d 1314, 1316 (8th Cir.1990). This instruction was not error, much less plain error
 
 
 [5]
 This is a proper basis for denial of an acceptance-of-responsibility reduction. See U.S.S.G. § 3E1.1, comment. (n. 1(g))
 
 
 [6]
 Askew's PSR reported that he was involved in 1.3 kilograms of the methamphetamine distributed during the conspiracy. Although that quantity would otherwise produce a sentencing range of 63-78 months under the Guidelines, "Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence." U.S.S.G. § 5G1.1(b); see United States v. Savage, 863 F.2d 595, 600 (8th Cir.1988), cert. denied, 490 U.S. 1082, 109 S.Ct. 2105, 104 L.Ed.2d 666 (1989)
 
 
 [7]
 Askew provided no substantial assistance to the government and therefore did not receive a downward departure motion pursuant to 18 U.S.C. § 3553(e). That is the only basis for a departure from a mandatory minimum sentence. See United States v. Carnes, 945 F.2d 1013 (8th Cir.1991); United States v. Hall, 943 F.2d 39 (11th Cir.1991); United States v. Sharp, 883 F.2d 829 (9th Cir.1989)
 
 
 [8]
 When Glasco failed to appear, counsel held an in-chambers conference with the district court which included the following:
 THE COURT: I will also admonish them not to use [Glasco's] absence against the other Defendants. You say you can't use it against Leland. Do you want me to emphasize--
 MR. ADAMS (for Edwards Jr.): Leave it alone.
 MR. SMITH (for Edwards Sr.): I feel the same way.
 MR. KROHA (for Askew): Yes.
 The court then instructed that the jury should not infer Glasco's guilt from his flight. Appellants made no objection to this instruction, which made no mention of the relevance of Glasco's flight to the other defendants.