UNITED STATES of America, Appellant,

v.

**Jack PARDUE and Michel Pardue, Appellees.**

No. 91–2307.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 11, 1991.

Decided Jan. 4, 1993.

Rehearing and Rehearing En Banc Denied Feb. 16, 1993.

---

Phillip A. Moon, Fayetteville, AR, argued, for appellant David Pardue in No. 91–2290.

Jennifer Horan, Fayetteville, AR, argued, for appellee Michel Pardue in Nos. 91–2307, 91–2388.

John Wesley Hall, Jr., Little Rock, AR, argued, for appellee Jack Pardue in Nos. 91–2307, 91–2388.

Vicki S. Marani, Washington, DC, argued (J. Michael Fitzhugh and William M. Cromwell, on the brief), for the U.S. in Nos. 91–2290, 91–2307 and 91–2388.

Before LAY,[*] Chief Judge, WOLLMAN and HANSEN, Circuit Judges.

PER CURIAM.

Jack Pardue made three motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 alleging entrapment as a matter of law and outrageous government conduct. The trial court denied the first two motions, made first at the close of the government's case in chief and then at the close of all the evidence, but granted Pardue's renewed third motion after the jury had found defendant Jack Pardue guilty of two felonies in a murder-for-hire scheme. *See* Fed.R.Crim.P. 29(c). The trial court, in its third look at the motions, found both entrapment as a matter of law and outrageous government conduct, 765 F.Supp. 513. The government appealed the judgments of acquittal. We reverse and order the verdicts reinstated and remand the case for entry of judgments of conviction against Jack Pardue.

[*] The Honorable Donald P. Lay was Chief Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 7, 1992, before the opinion was filed.

In order for entrapment as a matter of law to be present, it must clearly appear that it was the government agent who originated the criminal design, that the agent implanted in the mind of an innocent person the disposition to commit the offense, and that the innocent person then committed the crime at the government agent's urging. *United States v. King,* 803 F.2d 387, 389–90 (8th Cir.1986) (per curiam) (citing *United States v. Randolph,* 738 F.2d 244, 245 (8th Cir.1984) (per curiam)). In reviewing the trial court's ruling on the motion for acquittal, this court must view the evidence in the light most favorable to the government. *United States v. Resnick,* 745 F.2d 1179, 1186 (8th Cir.1984).

Based upon a thorough review of the record, we find there was sufficient evidence for a reasonable jury to determine that Jack Pardue was not entrapped and that he was guilty of conspiracy to use interstate commerce facilities in connection with a murder for hire, and engaging in or aiding and abetting interstate travel in connection with murder for hire as charged in Counts 1 and 3 of the Indictment. Some of that evidence is recited in the companion case opinion. The evidence concerning Jack Pardue's intent and the extent of his involvement in the charged offenses was without doubt conflicting, and the witnesses for both the prosecution and the defense were subject to attacks upon their credibility of some intensity. However, it was the jury's function to assess the credibility of each of the witnesses, including the defendants (each of whom testified in his own defense), and to sort out and weigh the evidence against the court's instructions.

Contrary to the views expressed in the dissent, we do not find it so clear that the murder-for-hire scheme terminated when David Pardue pleaded guilty to perjury on July 9. The testimony concerning this matter was in conflict. There was testimony from Gary Garrett that when David returned to the prison in mid-July from his state court perjury guilty plea proceeding in Benton County, David still was of the mind to have the Harringtons killed. (JA 142). David testified that he was not so inclined, but his letter to "Chuck" of August 6 (GX 27) clearly shows such an intent. ("No more money will be payed [sic] until the job is done, the money will be payed [sic] to you …") Nor are we convinced that it was the government who "completely resurrected" the conspiracy when it staged the murders in September. Agent Danzer's continued involvement was clearly solicited by David's letter. In addition there was ample time between "Chuck's" phone call of September 16 informing Michel that the murders were going to occur on the night of September 18/19 for Michel and/or Jack to call it off, go to the authorities, or warn the intended victims. Their stated reason for not doing any of the three was fear for their own lives. The jury was instructed on such a coercion defense by the trial court and rejected it.

The evidence, when viewed in the light most favorable to the verdict, from which a reasonable jury could convict the defendant Jack Pardue included the following. Michel told "Chuck" in the prison parking lot on July 1 that the remaining $4,500 would come from money his grandfather had. (JA 186). Michel, having paid "Chuck" $250 on July 1 to murder the Harringtons, told his grandfather Jack early on the morning of July 2 of the happenings at the prison and of Michel's intention to meet "Chuck" at Gentry later that day to give him the second $250. (JA 490). During that early morning conversation with Michel, Jack told Michel that there might be a young child in the Harrington home. (GX 15). The second $250 came out of David's safe located in Jack's home and Jack knew that Michel had taken it and for what purpose. (JA 522). After Michel returned from Gentry on July 2 where he gave "Chuck" the second $250 and the better photographs of the Harringtons, and pointed out their residence, Jack and Michel were talking on the telephone at about 6 p.m. when "Chuck" called. Jack waited for two or three minutes on "call waiting" while Michel talked to "Chuck" and then Jack hung up. (JA 492). Jack called back while "Chuck" and Michel were still talking about the murder plan, and Michel put

"Chuck" on hold to talk to Jack. When Michel came back on the line with "Chuck," he revealed that he and his grandfather had been again talking that evening about the presence or absence of a small child in the Harrington home, certainly a complicating factor in the murder scheme. Michel further stated that Jack had said "it's happening too fast for him" and Michel said it was "a little too fast for me too." (GX 22). When "Chuck" expressed a need to see the rest of the cash before the killings occurred, Michel responded, "We are on the same ground you are. We didn't want to send you five and just be left out in the dark." Michel also informed "Chuck" that Jack had been subpoenaed for David's anticipated perjury trial and that his grandfather was also "going to have to have an alibi." At "Chuck's" suggestion that they meet at Shoney's at 9 p.m. that night so he could see the money, Michel said, "Let me call my grandpa" and "I'll call you back." When Michel called back, he said that his grandfather was willing to meet with "Chuck" at Shoney's.

Jack drove to Shoney's with his wife in a vehicle separate from Michel's. While Michel was conversing with "Chuck," Jack entered the restaurant, surveyed the scene, and left. (Tr. 349, 356). When "Chuck" and Michel left Shoney's, Michel went to talk to Jack in Jack's pickup truck while "Chuck" waited. When Michel returned, he told "Chuck," "My grandpa says he don't want to talk to you, Chuck, you know, he's funny about that stuff." When Chuck responded that it sounded to him like grandpa was the one calling the shots and that Michel was "kinda like in the middle," Michel responded "Yeah, between him and my Dad, and he's worried that he thinks he should be out of town." (Ex. 23). When "Chuck" then expressed some concern about any delay, Michel responded that, "We don't mean to put you out, Chuck."

After "Chuck's" phone call on September 16, Michel told his grandfather that the "deal's still on" and that it was going to happen "in a couple of days or something, 18th or 20th or something like that." (JA 506, JA 508). When Michel told Jack that the killings had occurred and that "Chuck"

would have photographic proof to show him at Shoney's, Jack went with Michel to Shoney's. This time, however, Jack did not go inside the restaurant.

On September 23, Jack and Michel met with David at the penitentiary, described to David how the Harringtons had been killed, and decided to pay the $4,500 by mailing it to the Oklahoma post office address. The next day, Jack drove into Oklahoma and mailed the $4,500 in cash packaged in a pocket *New Testament* to "Chuck" at the Oklahoma address he had provided. When Jack was arrested, a slip of paper with the Harringtons' address on it (which bore Michel's fingerprint) was found in Jack's wallet.

■ Surely Jack's actions in driving across the Arkansas/Oklahoma state line and in using the United States mail to convey the payoff portion of the contract killer's price (conduct Jack readily admitted during his own testimony (JA 518)) met all the factual elements of Count 3 of the Indictment. The disputed issues in this case were raised by the defenses of entrapment and coercion, on which the jury was fully and adequately instructed and which the jury decided adversely to the defendants. With respect to the conspiracy count (Count 1), we have already found sufficient evidence exists to support the jury's finding that the charged conspiracy existed between David and Michel. *United States v. Jack Pardue and Michel Pardue*, 983 F.2d 835, 840 (8th Cir.1993.) Our cases hold that "once the government has proved the existence of the conspiracy, however, only slight evidence is needed to connect a particular defendant to the scheme." *United States v. Turner*, 975 F.2d 490, 494 (8th Cir.1992) (citing *United States v. Lee*, 743 F.2d 1240, 1250 (8th Cir.1984)). *See also United States v. Askew*, 958 F.2d 806, 810 (8th Cir.1992). As recited above, more than slight evidence exists in this case that the jury could reasonably use to connect Jack to the conspiracy charged in Count 1. It was for the jury to decide from the evidence, both direct and circumstantial, whether Jack's involvement was criminal in

nature, or whether he was merely acting as a protective grandfather.

■■■ The tendered defenses of entrapment and coercion were likewise factual issues for the jury to resolve. Because the evidence was in conflict, it was for the jury to decide if Jack did what he did because he was predisposed to and willingly did so, or whether he did so because he was entrapped or out of fear for his and his family's lives. Where the facts as to entrapment are disputed, the issue must ordinarily be submitted to the jury. *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *Mathews v. United States*, 485 U.S. 58, 62, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Crump*, 934 F.2d 947, 956 (8th Cir.1991); *United States v. Pfeffer*, 901 F.2d 654, 656 (8th Cir.1990); *United States v. Leroux*, 738 F.2d 943 (8th Cir.1984). Because the evidence in this case pointed to more than one reasonable conclusion, the district court was in error when it determined that Jack had been entrapped as a matter of law by the undercover agent. Having so determined, we need not address the difficult issue of private citizen middle-man derivative entrapment raised in this case. *See, e.g., United States v. Hodges*, 936 F.2d 371 (8th Cir.1991).

Here the jury could have reasonably determined that Jack Pardue was not entrapped. There was substantial evidence which showed that the idea to kill the Harringtons and to use a hired killer to do it originated not with any government agent but with Jack Pardue's son David who was confined in an Arkansas prison. It was David who enlisted Michel's aid in the scheme, and there was sufficient evidence for a jury to conclude that it was Michel and David (and not Agent Danzer posing as the hitman) who involved Jack in the plan. The scheme to pay the money by mailing it to a post office box of "Chuck's" own choosing was laid out in David's August 6 letter to "Chuck." Jack did so only after a joint meeting with Michel and David at the prison on September 23 when the decision to pay was taken.

■ The correct test to apply in the determination of a motion for judgment of acquittal is: "A motion for judgment of acquittal should only be granted where the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of any essential elements of the crime charged." *United States v. Mundt*, 846 F.2d 1157, 1158 (8th Cir.1988) (citation omitted) (emphasis added). In other words, the test is whether "a reasonable fact finder could have found guilt beyond a reasonable doubt." *United States v. Garrett*, 948 F.2d 474, 476 (8th Cir.1991) (citation omitted). Under this standard, the district court has "very limited latitude." *United States v. Jewell*, 893 F.2d 193, 194 (8th Cir.1990). In deciding a motion for judgment of acquittal, the court can neither weigh the evidence nor assess the credibility of the witnesses. *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). The test is the same in this court as it is in the trial court. Applying that test to the evidence in this case, we conclude that a reasonable fact finder could have found Jack Pardue guilty beyond a reasonable doubt.

■■ We also hold that the district court was in error with respect to its alternative ground for acquittal, i.e., that the government had engaged in such outrageous conduct that under principles of due process it was obligated to acquit the defendant Jack Pardue. The level of outrageousness needed to prove a due process violation is "quite high," and the government's conduct must "shock the conscience of the court." *United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir.1990), *rev'd on other grounds*, — U.S. —, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). The issue is one of law for the court. *United States v. Quinn*, 543 F.2d 640 (8th Cir.1976). Our close review of the government's conduct in this case convinces us that it does not fall within that narrow band of "the most intolerable government conduct" for which the defense is reserved. *United States v. Musslyn*, 865 F.2d 945, 947 (8th Cir.1989). The government did not manufacture the

crime in this case; it did not implant the criminal design in any of the Pardues. It was Michel who first told Agent Danzer that some of the money to pay for the killing would come from Jack Pardue. The officer was justified in exploring the extent of Jack's actual involvement in the murder plot. We do not find the required level of outrageous misconduct that requires acquittal on due process of law grounds.

Accordingly, we reverse the judgment of acquittal entered by the district court. We remand the case to the district court for reinstatement of the jury's verdicts of guilty as to Counts 1 and 3 and for entry of judgments of conviction thereon as to the defendant Jack Pardue, and for further proceedings.

LAY, Senior Circuit Judge, dissenting.

As to the grandfather, Jack Pardue, the district court wrote:

The evidence shows that Jack Pardue did not participate in any of this plan except to aid his entrapped grandson in carrying out what had been largely directed by Gary Danzer. There is also no indication from the evidence that there was any intent for Jack Pardue to become involved until Gary Danzer set out to make him become involved through the various artifices employed by him described above. In short, if Jack Pardue had any intent to commit the crimes for which he was convicted, that intent was also placed in his mind by the actions of Danzer utilizing Michel. Thus, the court finds that Jack Pardue was also entrapped as a matter of law.

There is no evidence that Jack Pardue was part of the original conspiracy agreement, let alone predisposed to commit this crime. The essence of conspiracy is the agreement to commit an illegal act, *United States v. American Grain & Related Indus.*, 763 F.2d 312, 315 (8th Cir.1985), and proof of a tacit understanding is sufficient to show a common plan. *United States v.*

*Hoelscher*, 914 F.2d 1527 (8th Cir.1990), cert. denied, *Giuffrida v. United States*, — U.S. —, 111 S.Ct. 971, 112 L.Ed.2d 1057 (1991) and cert. denied, *Meriwether v. United States*, — U.S. —, 111 S.Ct. 2240, 114 L.Ed.2d 482 (1991). Here, there was no evidence that Jack Pardue knew about the conspiracy before Danzer insisted on meeting with him to see the money. Jack Pardue's name was mentioned when Michel Pardue promised that the money would be paid by his grandfather. However, there was no evidence at trial that the grandfather even knew of the murder plan at that time. The grandfather was not present at the initial meeting with agent Danzer in the prison, at the subsequent meeting in the prison parking lot, or at any meeting with Danzer thereafter. Indeed Jack Pardue refused time and again to meet with Danzer. Thus, no evidence exists which would support a finding that Jack Pardue tacitly agreed to the murder scheme. On the other hand, there is no question that Danzer on several occasions through his dealings with Michel Pardue, repeatedly attempted to meet and criminally involve Michel's grandfather in the scheme.

Moreover, I find there exists no evidence prior to September when the bogus murders took place from which a jury could find beyond a reasonable doubt that Jack Pardue acted in furtherance of the conspiracy.[1] The only possible evidence of an overt act before July 9 that can be considered incriminating is Jack Pardue's accompanying Michel Pardue to meet Danzer on July 2. However, Jack Pardue never entered the restaurant; he remained in the car. I find this standing alone does not constitute sufficient evidence to convict. Jack Pardue testified that he accompanied Michel Pardue because of his fear for Michel's safety. Although the jury had a right not to believe this testimony, the possible rejection of it does not prove that Jack had committed any act in furtherance of

1. Had Jack been part of the conspiracy agreement, it would not have been necessary for the government to show he acted in furtherance of it because an overt act of a single conspirator knowingly committed in furtherance of the conspiracy is considered the act of all conspirators. *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946).

the conspiracy or had tacitly agreed to become part of the conspiracy.

It has long been the rule that "where the government's evidence is equally strong to infer innocence of the crime charged as it is to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal." *See United States v. Kelton,* 446 F.2d 669, 671 (8th Cir.1971). Mere association, as opposed to participation, is not sufficient to establish guilt of a conspiracy. *United States v. Williams,* 341 U.S. 58, 64 n. 4, 71 S.Ct. 595, 599 n. 4, 95 L.Ed. 747 (1951). Indeed throughout the week prior to July 9, the evidence shows that Jack Pardue tried to dissuade Michel Pardue from getting involved. Michel Pardue's statement to Danzer that his grandfather wanted to stall until an alibi could be established cannot be considered an act in furtherance of the conspiracy because it goes only to what the grandfather may have thought about the conspiracy, not to anything he overtly did in furtherance of it. The evidence shows that Michel Pardue and Jack Pardue never discussed the substance of what their alibi would be and that the mere mention by Michel Pardue to Danzer of them wanting an alibi was purely a stalling technique used by Michel. No other evidence was presented at trial that the grandfather acted to further the conspiracy prior to July 9.

The original conspiracy involving Michel Pardue, *to kill the Harringtons before July 9* so that Mr. Harrington could not testify at David Pardue's perjury trial, terminated on July 9 when David Pardue pled guilty. The conspiracy to murder the Harringtons was completely resurrected by the government nine weeks later when it staged the murder and demanded the money from Michel Pardue. It is only then that evidence exists that Jack Pardue "joined" the conspiracy. The evidence shows that Jack Pardue ultimately mailed the $4500 to "Chuck Ross" once the "murders" had taken place because he feared for the safety of himself, his wife and Michel.[2] The entire staging of the murder, however, was the government's plan—used not to induce Michel Pardue, because there was already sufficient conduct to subject him to arrest without the staged murder—but to induce Jack Pardue to participate in the scheme.

Under such circumstances, I find that the government acted improperly by inducing Jack Pardue, albeit with Michel Pardue as its conduit, into paying the money to Danzer.[3] There exists no evidence that Jack Pardue was predisposed to enter the conspiracy when he aided Michel in delivering the payoff in September. As *Jacobson v. United States,* — U.S. —, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), makes clear, predisposition is tested at a time prior to the government's acts intended to create predisposition. *Id.* at —–—— n. 2, 112 S.Ct. at 1540–41 n. 2. The evidence shows that Jack Pardue had refused to meet Danzer and constantly tried to persuade Michel to do the same. I would hold that the district court was correct in finding that Jack Pardue was entrapped as a matter of law.

In *Jacobson* the Court observed: " '[T]he government [may not] pla[y] on the weaknesses of an innocent party and beguil[e] him into committing crimes which he otherwise would not have attempted.' " *Jacobson* at —, 112 S.Ct. at 1543 (quoting *Sherman v. United States,* 356 U.S. 369, 376, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958)).

**2.** Jack Pardue testified that he and his wife slept one night on an air mattress in his field because they feared "Chuck" would come to the house to hurt them.

**3.** The government urges that Jack Pardue cannot assert entrapment as a defense because Jack was induced by Michel Pardue to make the payment and that Jack cannot claim entrapment when the inducement is by a private individual. *See United States v. Emmert,* 829 F.2d 805, 808 (9th Cir.1987) ("[T]he entrapment defense is only available to defendants who were directly induced by government agents"). Here, however, it is undisputed the government worked through Michel, as a conduit or unwitting middleman, in instilling fear in him, that Michel's life would be in jeopardy unless the grandfather paid the money. *See United States v. Pilarinos,* 864 F.2d 253, 256 (2d Cir.1988) ("A defendant is entitled to a derivative entrapment defense ... when the government's inducement was directly communicated to the person seeking [the] entrapment charge by an unwitting middleman.").

There is little doubt the government played on the love and affection of a grandfather for his grandson in getting Jack Pardue to pay money for a bogus murder as protection for Michel Pardue from threats made by government agents.

I would sustain the district court judgment of acquittal.